UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Tangela Bankston and Tiffany Robinson, *individually and on behalf of all others similarly situated*,<br><br>        *Plaintiffs,*<br><br>              v.<br><br>Landis Technologies, Inc., Landis Properties II LLC, Landis Properties I LLC, Landis Properties Investors II LLC, Landis Properties Investors LLC, Landis Properties Holdings II, Landis Properties Holdings LLC, Cyril Berdugo, Thomas Petit, Global Atlantic Financial Group LLC., Forethought Life Insurance Co., Global Atlantic Assurance Ltd., and Sequoia Capital Operations LLC,<br><br>        *Defendants.* | Civil Action No.<br><br><br><br><br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

### I.  INTRODUCTION

1.      Plaintiffs Tangela Bankston and Tiffany Robinson bring this action against various "Landis Properties" business entities, the principals associated with those entities, Thomas Petit and Cyril Berdugo (referred to collectively as "the Landis Defendants"), and their investor co-conspirators, Global Atlantic Financial Group LLC, Forethought Life Insurance Company, Global Atlantic Assured Ltd. and Sequoia Capital Operations LLC (referred to collectively as "the Investor Defendants"), for operating and conspiring to operate a fraudulent residential, rent-to-own enterprise in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d); for violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679 *et seq*.; and for violations of state laws.

2.      The Landis "Pathway to Homeownership" program is a rent-to-own scheme that purports to guide aspiring homeowners through a process in which Landis purchases a property "for them," allows them to move into "their" property immediately as supposedly transitional renters, provides them with credit "coaching" to make them mortgage-qualified during the course of the lease term and helps them "save" funds toward the future purchase of the property from Landis at the end of the lease. However, this is all a carefully crafted façade.

3.      In reality, Landis is operating a scheme in which aspiring first-time home-buyers who are not mortgage-qualified are led to believe they have been brought onto a specially designed home-purchase "pathway." In fact, this "pathway" is illusory. They pay a hefty "down payment" towards the unlikely future purchase, plus additional monthly "savings" payments. Contractually, they end up being little more renters with an option to buy the property at the end of the lease at a price set by Landis. If the purchase fails, as most do, the supposed customer "savings" are forfeited to the Defendants. Moreover, the separate lease agreement requires them to assume the landlord's legal responsibility to manage and maintain a habitable rental premises.

4.       The Landis business model is basically a fee-churning scheme in which the illusory "pathway to homeownership" is a pretense enabling the company to rent single-family homes without incurring the expense of rental management and maintenance, while pocketing tenants' investments toward purchases that, for the most part, never happen.

5.      Publicly available data from several housing markets where Landis is active confirms that failed purchases are far more prevalent than successful ones. In Philadelphia County, Pennsylvania, 100% of the consumers who entered the Landis program failed to exercise their putative option to buy the property. In Delaware County, Pennsylvania, the figure was 79%; and in the state of Georgia it was 87%.

6.      The Landis scheme unfolds in a systematic and consistent manner:

    a.  Consumers are encouraged to search for a home they would like to purchase, but within narrow property criteria imposed by Landis. Once a property is selected, Landis buys the property solely in its own name with no consumer involvement in the negotiation of the price.

    b.  The consumer then signs an agreement of sale to purchase the property back from Landis, one or two years in the future, for a fixed price at 3% per year above the price Landis pays. The consumer is obligated to make a substantial upfront down payment but that payment is not listed as a deposit in the agreement of sale. In the agreement of sale, the consumer also waives any contingency regarding the condition of the property.

    c.  At the same time, the consumer signs a lease agreement to rent the property Landis has just bought for the same one- or two-year term of the agreement of sale. Under the lease agreement, all responsibility for maintenance and repair costs—including those related to habitability—is illegally shifted to the tenant.

    d.  In addition to the monthly rental payment, the tenant is also obligated to make a monthly "savings" contribution. These "savings" payments, along with the "down payment" are supposedly escrowed by Landis for the tenant, but in fact all or nearly all of those sums end up being forfeited to Landis when the future purchase fails to materialize.

    e.  After the victimized consumer abandons the property or is evicted, Landis either sells the property to a third party and pockets the profits along with the forfeited tenant "savings," or it uses the property to ensnare a new consumer into yet another, illusory Pathway to Homeownership, rent-to-own transaction.

7.      Because the Landis Defendants operate this scheme through an associational enterprise of Landis companies, investors, real estate brokers, and others, and through the use the interstate wire system, they are inflicting severe economic harm to consumers in violation of RICO, 18 U.S.C. § 1962(c), which the consumers can remedy under 18 U.S.C. § 1964(c).

8.      The Investor Defendants are sophisticated participants in the single-family rental business and/or venture capital markets. Because of the extensive due diligence these entities conduct prior to investing, they are fully aware of the nature of Landis Defendants' deceptive scheme. These investment entities know that Landis makes its money not when consumers actually become homeowners through the Landis process, *i.e.,* by eventually purchasing the

homes they are renting from Landis at only 3% more than its acquisition price. Rather, the Investor Defendants know that Landis' real profit comes from the avoidance of ordinary landlord costs and from the forfeited portions of tenant "savings" and deposits, as well as from subsequent sales of the same property to third parties at appreciated prices, after the consumer is unable to complete the purchase of the home at the end of the lease term. Because of their knowledge of and agreement to further the Landis scheme, the Investor Defendants are separately liable under 18 U.S.C. § 1962(d) as RICO co-conspirators.

9.    In addition, part of the Landis Pathway to Homeownership marketed to the consumer is a Landis credit repair service ostensibly helping the tenant become mortgage-qualified over the course of the lease term. For the majority of Landis tenants who never become owners of their rental properties, this credit "coaching" is the only service they obtain in exchange for the payments they are required to make over and above their rental payments. But credit repair services are strictly regulated by CROA, including a prohibition against any advance payments before such services are rendered. *See* 15 U.S.C. § 1679b(b). Thus, as to those Landis tenants who receive the "coaching" service but whose deposits are forfeited when they fail to complete the "pathway to homeownership," Landis is systematically violating CROA.

10.    The Landis program projects a veneer of altruism in which the company is committed to assist financially distressed people who want to take steps to become homeowners but cannot qualify for mortgages. This veneer targets minority populations. Landis specifically markets to African American consumers, using African American real estate brokers, as well as the endorsement of celebrity entertainers such as Jay-Z and Will Smith, to steer potential victims its way.

11.     Because Landis is engaged in deceptive conduct that creates the likelihood of consumer confusion and misunderstanding, which conduct causes economic harm, Landis is also liable under the "Unfair and Deceptive Practices" state statutes where it operates, including the Pennsylvania Unfair and Deceptive Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq.

## II.    THE PARTIES

12.     Plaintiff Tangela Bankston is an individual who resides in Levittown, Pennsylvania.

13.     Plaintiff Tiffany Robinson is an individual who resides in Philadelphia, Pennsylvania.

14.     Defendants Landis Technologies, Inc., Landis Properties II LLC, Landis Properties I LLC, Landis Properties Investors II LLC, Landis Properties Investors LLC, Landis Properties Holdings II, Landis Properties Holdings LLC ("the Landis Defendants") are Delaware business entities that are all headquartered at the same Wall Street address in New York City.

15.     Defendants Cyril Berdugo and Thomas Petit are individuals who, upon information and belief, reside in New York. During the relevant period they owned and operated the above-mentioned Landis entities.

16.     Defendant Global Atlantic Financial Group, LLC ("Global Atlantic") is an insurance company based in New York. It is wholly owned by the global investment company, KKR & Co. Global Atlantic markets annuities through its wholly-owned Defendant Forethought Life Insurance Company, based in Indianapolis, and operates a reinsurance company through Defendant Global Atlantic Assured, Ltd., based in Bermuda. Defendants Global Atlantic Financial Group, Forethought Life Insurance Co. and Global Atlantic Assured, Ltd, will be referred to collectively as "the Global Atlantic Defendants."

17.     Defendant Sequoia Capital Operations LLC ("Sequoia Capital") is a venture capital company incorporated in the State of Delaware with its principal place of business in Menlo Park, California. Sequoia Capital's business involves operating various corporate and partnership entities to channel funding from investors into technology sector startups such as Landis.

### III.   JURISDICTION & VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States. Jurisdiction also exists under 18 U.S.C. § 1964 over Plaintiffs' claims brought under RICO. Supplemental jurisdiction exists over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) in that that they form part of the same case or controversy under Article III of the United States Constitution as the federal law claims.

19.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; and/or (b) engaged in a RICO conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. This Court further has personal jurisdiction over all Defendants in this action pursuant to 18 U.S.C. § 1965.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claim occurred, because one or more of the Defendants resided, transacted business, was found, is licensed to do business, and/or has agents in this District, and because the Defendants are subject to personal jurisdiction in this District.

## IV.    THE FACTS

### A.  **The Landis Business Model**

21.     The first Landis company, Defendant Landis Technologies, Inc., was founded
around 2017 by Defendants Berdugo and Petit, who were classmates at Stanford Business
School. According to a 2018 interview with Berdugo, the company began as a "proptech" firm
that used data to help institutional investors identify and buy single-family rental buildings.
"Proptech" is jargon that refers to applying computer technology and algorithms to real estate
market analysis and transactions.

22.     By 2019, however, Defendants Berdugo, Petit, and Landis Technologies had
transitioned to a rent-to-own business, targeting prospective first-time homeowners who had
recently been denied a mortgage. Their concept was to take referrals from real estate brokers and
mortgage lenders and, using their technology to identify properties and consumers who, with
targeted help in accumulating savings and improving credit over the course of a one-year lease,
could purportedly become mortgage-qualified and could purchase the home at the end of the
lease.

23.     They raised approximately $15 million for this new business concept and created
the entities Landis Properties I LLC, Landis Investors LLC, and Landis Holdings LLC to
implement the business plan. Landis Properties I was created in order to purchase and resell the
residential properties. Landis Properties Investors was created to arrange and manage outside
investments necessary to capitalize and underwrite the purchase of residential properties. And
Landis Properties Holdings was created as the holding company to manage the flow of funds
among the operational entities.

24.      This first set of Landis affiliates would prove to be a pilot program for a second
set of affiliates created in 2021. The Landis entities secured $165 million in new investments,

including a $150 million debt facility, to expand their scheme. At that time, Defendants Berdugo and Petit created Landis Properties II LLC, Landis Properties Investors II LLC, and Landis Properties Holdings II LLC to carry out the same function as the first set of affiliates, but on a greatly expanded scale on behalf of the new investors.

25.     As a result of this investment, the Landis rent-to-own program expanded across multiple states and has now ensnared at least hundreds of consumers. Regardless of Defendants' original intentions, the supposed "Landis Pathway to Homeownership" is, in reality, an unconscionable, deceptive, unfair and fraudulent lease arrangement in which an expensive, disadvantageous lease is packaged to induce the tenant into illegally maintaining the property at her own expense and paying a rental premium, both of which are supposedly justified by an intended aim of transferring ownership to the tenant, an aim that is rarely achieved.

26.     The Landis business model is to induce tenants to believe that, unlike an ordinary lease agreement, they will eventually own their home by virtue of three unique contractual features of the Landis scheme:

   a.   an option to purchase at the end of the lease for 3%/year over the price that Landis paid to acquire the property;

   b.   a "savings" program through which Landis "helps" the tenant accumulate funds towards the cost of that purchase; and

   c.   Landis-provided credit repair assistance over the course of the tenancy designed to make the tenant mortgage-qualified.

27.     Through a carefully cultivated appearance of a lease arrangement that is a means toward eventual ownership, Landis induces the tenant to assume financial responsibility for maintenance and repair expenses that normally (and as required by law) are the responsibility of a landlord. Using Defendant Berdugo's own words, the point is to get the tenant "to behave as if

they already owned the house." *See*

https://www.youtube.com/watch?v=Zynmn3KCwoQ&t=790s.

28.    The tenant is also required to pay deposits towards the supposed future purchase, including a large upfront payment and additional monthly payments over and above the separate payment designated as the "rent." Landis represents that these "savings" will be escrowed by Landis for the benefit of the tenant. Yet, undisclosed in the marketing of its so-called Pathway to Homeownership, tenants who fail to complete the purchase forfeit the "savings" as a contract-break penalty leaving Landis free to re-rent the property to a new consumer under the same terms and to repeat the process.

29.    Landis stands to make more money from transactions where tenants fail to purchase their first home than when a tenant is able to meet the terms of the rent-to-own program and ends up purchasing the home.

30.    Landis uses algorithms to identify aspiring homeowners who have a particular financial, credit and income profile and who are likely to be especially vulnerable to the scheme. It describes its "typical client" as "a prospective homeowner who is unable to get a mortgage due to credit, down payment savings or debt. Although they may not be mortgage-ready yet, Landis' dynamic underwriting technology can determine whether the client might qualify for a mortgage in the next 12 to 24 months."

31.    A central component of the Landis "program" is a credit-coaching service. This service involves monthly, one-on-one advice provided by an assigned "coach," who pulls the tenant's credit report and identifies bill-paying priorities and other strategies to improve the consumer's credit score in order to become mortgage-qualified. The tenant is also provided with a coaching app developed by Landis to provide a visual representation of progress being made

towards the mortgage-qualification goal. Defendant Petit has described this service as "giv[ing] our clients easy, achievable steps to become eligible for a mortgage. Getting ready for a mortgage is often a stressful and difficult process. Landis makes it easy, fun and approachable."

32.     These representations about the coaching service are deliberately misleading. While these representations are designed to create a picture for the typical Landis customer of a hand-holding process that "prepares" the tenant to get a mortgage to buy the property, in fact, Landis provides the tenant no assistance in actually identifying and applying to mortgage lenders. Despite the repeated assurances about being on a Landis-designed "Pathway to Homeownership," Landis tenants are essentially left to their own devices to find a mortgage at the end of the lease. Moreover, as will be shown below, one of the multiple form contract documents Landis uses expressly disclaims any responsibility to provide even the promised credit-coaching service.

33.     As to the other supposed element of the Landis "Pathway to homeownership," *i.e.,* the "savings" program, Landis requires the tenant to make an upfront payment separate and in addition to the rental security deposit. They call this an "initial down payment contribution" towards the supposed eventual purchase costs. Then, in addition to the monthly rent payment, Landis requires the tenant to pay monthly payments to add to this accumulated "savings," calling the down payment and monthly savings payments "Homeownership Credits," which, according to Landis, will be held for the tenant's benefit in an escrow account.

34.     However, there is no escrow account and Landis pockets all or most of the tenant "savings" at the end of the rental, claiming both a contract-break "Exit Fee" and treating the remaining funds as an extra, undisclosed security deposit.

35.     To further reinforce the appearance that the consumer is buying and not merely renting, Landis uses real estate brokers to help prospective customers search for their "dream home." Real estate brokers who represent buyers generally do not earn commissions from customers who do not qualify for a mortgage. But Landis offers commissions to referring brokers, who, through that arrangement, effectively become agents of Landis, not the consumer. For those consumers who contact Landis on their own, Landis will assign them a broker already in the Landis network to assist with the property search.

36.     A key component of the Landis scheme of false and misleading representations about its Pathway to Homeownership program is its website.  Here is how the "How It Works" page of the website currently appears at https://www.landis.com/rent-to-own/, with all applications from prospective consumers being initiated from this page:



37.     This webpage then describes the following steps in the Pathway to Homeownership:

**01**

### Apply to Landis

Find out if you pre-qualify for the Landis program in minutes.

The application is free, requires no commitment, and does not affect your credit score.



**02**

### Receive home budget

Our underwriting team will verify your financial documents and give you an approved home budget to go home shopping with.

Your dedicated Client Advisor and chosen Realtor will guide you through the approval, touring & purchase process.



**03**

### Choose your home

Your dedicated Client Advisor and chosen Realtor will help you find a home within your approved budget that meets Landis property criteria.

See where Landis buys homes



**04**

### We buy the home you choose

We make an offer, perform due diligence and buy the home for you. This includes all closing costs and fees.

You make an initial deposit of 2-3% of the purchase price that goes towards your security deposit and down payment savings.



**05**

### Rent from us

Rent your home from us while you prepare to buy it.

Your monthly payment varies based on home purchase price and target market.

Use our Payment Estimator to calculate the maximum monthly payment based on the location and home price you select.



**06**

### Coaching prepares you for a mortgage

Whether you need to improve your credit score or save for a down payment, your dedicated Homeownership Coach will support you in creating a plan to become mortgage ready.

Learn about Coaching



### Buy your home back when ready

the home back from Landis.

How it Works     Agents     Markets     Resources



38.    Once a consumer, who is from a location where Landis is currently accepting applications, hits the "Get started as a homebuyer button" and enters some initial information, Landis will "prequalify" the applicant and will then request income documentation and the completion of a Final Application Form.

39.    Once Landis has approved a consumer, based on its algorithms regarding credit, income and financial criteria, it sends one or more standardized "approval" emails to the consumer. Like the information on the application webpage, these communications emphasize the home-purchase goal of the Landis program and identify a target home price—called a "budget" number—matching the consumer's financial profile.

40.    These form "approvals" are deliberately confusing as to the cost of the house that the consumer will be buying. They state that the customer has been approved for the future purchase of a property in the amount of an "Approved Budget" number. But these approvals also state that the actual price will be "3% above the appraisal price when Landis closes on the home."

41.    The form approvals state that, at the end of the "Homeownership Program," the customer will have saved 5.5 % of the purchase price from the combined "initial down payment" and monthly "savings" payments, which funds will be held by Landis "in an escrow account."

42.    These approvals omit any clear explanation about the disposition of the customer's savings in the event the customer fails to consummate the purchase at the end of the lease. They state that in the event the customer backs out before Landis obtains title, that all funds will be refunded, subject only to the reimbursement of any appraisal or inspection costs or other "pre-acquisition" expenses incurred by Landis. But Landis obtains title as soon as the

customer is committed, and the approvals do not specify what will happen to the "savings" at the end of the lease if she is unable to obtain a mortgage.

43.    The approval communications instruct the consumer to begin a search for a property within a stated price range, using a real estate broker selected by the consumer or assigned by Landis.

44.    The website also includes a "Partner" portal that targets real estate agents. *See* https://www.landis.com/agents/l This "Agent" webpage, from which the agent can submit inquiries and applications, has the following heading:



45.    An FAQ on site provides examples of the kind of an agent's buyer customers "who aren't eligible for a traditional mortgage" but from whom, nonetheless, the agent can earn a commission as an agent *for Landis*, including, "First-time homebuyers who are overwhelmed or confused by the buying process;" "Clients with past bankruptcies that were discharged at least 6-12 months ago;" and those with "limited income history."

46.    Landis has pre-determined the kind of properties it will approve. For example, it does not accept older properties that lack recent rehab work. This requirement favors investment properties that have had recent cosmetic renovations and which are most likely to appear clean and modern to unwary consumers. Consumers are steered towards properties that meet Landis's criteria, regardless of their own interest or preferences.

47.     Landis routinely approves selected properties that are priced substantially higher than the customer's "budget." The effect of this practice is to make it even more unlikely that the customer will ever obtain a mortgage to purchase their house at the end of the lease term.

48.     Once the customer has paid the "initial down payment contribution," Landis treats the customer as being locked in and will then proceed to negotiate an agreement of sale for the property with the owner without any involvement by the consumer on whose behalf the property is purportedly being purchased.

49.     Landis has little incentive to negotiate aggressively for the property. By the time it negotiates with the current owner, it has already collected a down payment from the consumer based on its determined price, and it has investor-provided funds already at hand to use for the purchase, as will be described below.

50.     Once Landis has obtained an agreement of sale with the property owner, it sends what it describes as a "Landis Home Ownership" agreement via email to the consumer. Landis will not go to closing on its purchase of the property until it has gotten the consumer's signature on the various documents comprising the "Landis Home Ownership" agreement.

51.     The standard Landis Home Ownership agreement includes four separate, standardized contract documents that, in several ways, contradict the earlier "approval" communications and contradict each other:

  a.  Contract Document #1 - a real estate agreement of sale that makes no reference to a lease;

  b.  Contract Document #2 - a residential lease agreement that makes no reference to the agreement of sale;

  c.  Contract Document #3 - a "Landis Pathway Overview;" and

  d.  Contract Document #4 - an "Addendum" to the agreement of sale.

All of these contract documents are presented together to the consumer simultaneously and must be signed electronically.

52.    For Contract Document #1, the Agreement of Sale, Landis uses a standard form, appropriate to the particular state in which the property is located. The Agreement of Sale states a set price, ordinarily at 3% per year above the price Landis pays, with a settlement date set one or two years in the future.

53.    The Agreement of Sale form also contains a standard mortgage contingency whereby all upfront payments will be refunded in the event no mortgage is obtained. However, despite the consumer having already paid Landis a substantial "down payment," that payment is not listed in the agreement of sale as a deposit credit.

54.    The agreement of sale contains a buyer's waiver of the right to inspect the property prior to the future purchase, meaning, as a practical matter, that the tenant-buyer, who will be living in the property as a tenant before the future closing, will be locked in at the price originally set, regardless of the property's condition or regardless of problems that become apparent over time.

55.    The Lease, Contract Document #2, uses a standard residential lease form, appropriate for the particular locality. The proposed lease will generally be for a one-year term, but can be extended to a two-year term, depending on the expectation of a purchase date one or two years in the future.

56.    Although the warranty of habitability exists as a term in all residential leases in the jurisdictions where Landis is active, Landis's standard lease shifts nearly all the burden of repair and maintenance onto the tenant. According to typed-in language that, as a matter of general practice, Landis adds to the lease, the tenant is responsible for the first $200 in repairs,

whether or not the repair relates to habitability. Moreover, the tenant is responsible for the total cost of any and all repairs in excess of $200, with Landis crediting one-half the cost, but only if the tenant provides Landis with multiple estimates before proceeding with such repairs.[1]

57. Landis—which is located in a Wall Street office in New York City—does not contract with any local rental management companies to manage its rental properties in the various states where it operates. For repair or maintenance issues, the lease refers customers to a "property management" email address at the Landis office. Tenant complaints about property condition problems generally result in a telephone call from Landis that, in essence, directs tenants to resolve the problem themselves.

58. The standard Lease provides for payment of a specified security deposit, set at the amount of one monthly rent payment. This is in addition to the substantial upfront down payment the consumer has already paid but, as in the Agreement of Sale, there is no mention of that deposit in the Lease either. Moreover, the Lease also does not mention the additional monthly payment that the tenant is required to pay towards the supposedly escrowed "savings."

59. Contract Document #3, the "Landis Pathway Overview," states that Landis "intends to purchase" the property, which the customer "has agreed to rent" for the duration of the specified lease term "until the Customer obtains third-party financing to complete the purchase of the Property from Landis for a purchase price that the parties have determined evidences the anticipated fair market value of the Property at the end of this Agreement."

---

[1] In some states where Landis operates, the landlord's minimum obligations go beyond maintaining "habitable" conditions in the rental premises. *See, e.g.* Ohio Rev. Code Ann. § 5321.04 (any landlord must keep all the house systems in "good and safe working order" and keep the premises "in a safe and sanitary condition"); N.C. Gen. Stat. Ann. § 42-42 (same).

60.    The Pathway Overview is the contract document that, in contrast to the Agreement of Sale and the Lease, lists all the payments that the consumer has actually made and is obligated to pay over the course of the parties' relationship. It lists (a) the already paid down payment, (b) the required security deposit and monthly rent payment, and (c) the additional required monthly "savings" payments, which, together with the down payment are designated as "Landis Homeownership Credits."

61.    As mentioned above, the original approval communications stated the consumers investments towards the purchase, including the initial downpayment and the monthly "savings" payments—now called "Homeownership Credits"—would be placed in an "escrow account." The form Landis Pathway Overview states that these funds "shall be held by Landis for the benefit of the Customer," but does not mention any escrow account.

62.    Nor does it disclose anything about what happens to accumulated Homeownership Credits in the event the tenant fails to purchase the home from Landis. However, in the paragraph of the Pathway Overview that lists the tenant's monthly payment obligations—the rental payment and "the additional payment . . . for Landis Homeownership Credits"—the "additional payment" will "be counted towards the purchase of Property from Landis upon the termination of this Agreement (*or payable in whole or in part to Landis as liquidated damages in the event that Customer breaches this Agreement or fails to complete the purchase of the Property*." (emphasis added) There is no further explanation how such liquidated damages would be calculated or, in the event the purchase is not completed, what happens to the initial-deposit component of the "Homeownership Credits."

63.    Contract Document #4 that Landis has customers sign is titled the "Landis Pathway Agreement," and is subtitled "Addendum to the Purchase and Sale Agreement." This

Addendum includes the following language within a numbered paragraph entitled "Failure to Complete The Purchase":

> If Buyer fails to complete the purchase of Property within the term of this Addendum, including applicable extensions, having otherwise abided by the terms of this Addendum, Landis will refund Buyer the security deposit and any Landis Homeownership Credits paid by Buyer pursuant to Sections (1)(a) and (1)(b) (not including rent), *minus three percent (3%) of the Purchase Price as set forth in the PSA, any outstanding fees and payments owed to Landis, and any fees for damages to the Property (the "Exit Cost").* Buyer acknowledges and agrees that in the event that Buyer fails to complete the purchase of the Property, Landis shall have no further obligation to Buyer hereunder and shall be free to dispose of the Property as it sees fit, including by holding it and leasing it to another tenant, or by selling the Property to any other person. (emphasis added)

64.     The effect of this language is that *all* of the tenant's "Homeownership Credits", *i.e*, the initial deposit as well as the accumulated monthly "savings" payments—is potentially at risk of forfeiture as an "Exit Cost." As mentioned above, *supra* at ¶ 41, Landis sets up the required deposit and monthly savings payments to accumulate 5.5% of the "Purchase Price"[2] in "Homeownership Credits" by the end of the rent-to-own period, so a penalty of "3% of the Purchase Price" will already consume most of the consumer's deposited funds.

65.     But this language also allows Landis to deduct "any outstanding fees and payments owed to Landis, and any fees for damages to the Property." Essentially this means that Landis gives itself the right to treat any remaining funds as an undisclosed, additional rental security deposit—*even though the separate Lease agreement specifies a security deposit of only one month's rent*. Thus, contrary to the Lease, under this provision *in the Addendum to the Agreement of Sale*, Landis will apply any funds remaining after deduction of the 3% figure to any unpaid rent. And, given the way the Landis agreement works, it is likely there will be unpaid

---

[2] This is the purchase price that the customer would have to pay to buy the house from Landis, which is 3% more than the price Landis paid in the case of a one-year contract, and 6% more in a two-year contract. *See supra* at ¶¶ 26, 49, 52.

rent, as the rent-to-own period progresses towards the one- or two-year expiration date, without a mortgage approval and with the tenant having to pay for her own repairs.

66.     Many states strictly limit the amount of tenant security deposits. In Pennsylvania, for example, landlords are prohibited from collecting a security deposit of more than two months of rent during the first year of a lease, and no more than one month's rent during a second year. *See* 68 P.S. §250.511a. Thus, not only does the unlimited security deposit provision contained within the standard "Addendum" contradict the one-month deposit specified in the Lease, it also is illegal in states where Landis operates.[3]

67.     There is nothing in the website descriptions of the Landis program or in the "approval" communications, or in the other three contract documents comprising the complete Agreement, that even suggest that the "savings" funds that customers are paying to Landis for safekeeping towards a hoped-for purchase are subject to forfeiture "in the event the Buyer fails to complete the purchase."

68.     The following language in the standard "Addendum" also contradicts the centrality of credit coaching in the Landis program:

> From time to time during the term of this Agreement, as a proposed benefit to Buyer, Landis and/or partners or service providers may offer Buyer advice, tools, counseling, and/or incentives to improve Buyer's credit score and/or general creditworthiness. The Parties agree that such credit services shall be provided to Buyer as a courtesy, free of charge or obligation to Buyer. Landis shall be under no obligation to provide such services or to make such services available and makes no promises or guarantees that such services shall improve Buyer's credit

---

[3] *See, e.g.,* Ala. Code § 35-9A-201 (one-month limit); N.C. Gen. Stat. Ann. § 42-51(b) (maximum of two-months' rent).

score or creditworthiness, or that Buyer will obtain financing to purchase the Property from Landis.

69.     Thus, according to this form document in the multi-document agreement, the only actual contractual responsibility undertaken by Landis with regard to "preparing" the customer for a mortgage, along the promised "pathway to homeownership," is an obligation to sell the property to the tenant at the fixed price, without any contractually mandated assistance by Landis, if, on her own, the tenant somehow manages to obtain a mortgage within the one- or two-year period. Should that happen, the accrued Homeownership Credits would be applied to the costs of the purchase; otherwise, Landis has no other obligation to the customer and is entitled to keep most or all of the Homeownership Credits as a contract-break "Exit Fee."

70.     The vast majority of Landis tenants fail to acquire title to their home at the end of the purported "pathway to homeownership." These consumers end up having rented properties they were illegally required to maintain at their own expense, while losing most if not all of their substantial investments towards the illusory purchase.

71.     Even for those consumers who manage to get a mortgage on their own, they are stuck with the choice of either (a) using the mortgage commitment to purchase a property at a price set earlier by Landis, regardless of any defects in the property that may have become evident during the term of their tenancy, or (b) abandoning the property and their "savings."

72.     Once a consumer, for whatever reason, abandons the property or is evicted—and has lost all or nearly all her invested Homeownership Credits—Landis often uses the same property to rent to a new rent-to-own victim. In such circumstances, *i.e.*, where Landis already owns the property, it uses the same form contract documents with the new customer, including the statement in the Pathway Overview that refers to the property as one Landis "intends to purchase" for the consumer.

73.     Landis also regularly resells such properties to third-party buyers and collects the appreciated value of the property for the benefit of itself and its investors.

74.     Plaintiffs have discovered substantial Landis home purchase activity in the public records of Philadelphia and Delaware Counties in this district for the period 2021-2022.

75.     According to the Landis website, the company is currently accepting new rent-to-own customers in Alabama, Florida, Georgia, Indiana, Kentucky, North Carolina, Ohio and Tennessee.

76.     Based on an analysis of public records in Philadelphia County, Landis recorded the purchase of 20 homes between the first purchase March 2022 and October 11, 2022. Of these, only 2 were resold, but each of those 2 homes were listed on MLS prior to resale, indicating that they were resold by Landis to third parties. The remaining 18 properties are still being used as rental properties by Landis over 2 years after the original purchase. That is, 100% of the victims of Landis in Philadelphia have been unable to exercise the putative purchase option.

77.     Based on an analysis of public records in Delaware County, Landis recorded the purchase of 39 homes between the first purchase in November 2021 and October 11, 2022. Of these, only 8 were resold without being listed for sale on the MLS database. The remaining 31 properties were either resold by Landis to third parties or remain being used as rental properties by Landis over 20 months after the original purchase. Of the 8 that were resold without listing on MLS, only 2 were resold at or below the standard price of 3% per year above the price Landis paid. That is, at least 79% of the victims in Delaware County have been unable to exercise the putative option, and of those that did, most actually paid above the standard contractual option price.

78.     Based on an analysis of statewide public records in the State of Georgia, Landis recorded the purchase of 54 homes between the first purchase in May 2019 and October 11, 2022. Of these, only 7 were resold without being listed for sale on MLS, indicating that the remaining 47 properties were either resold by Landis to third parties or remain being used as rental properties by Landis over 2 years after the original purchase. Of the 7 that were resold without listing on MLS, only two were resold at or below the standard price of 3% per year above the price Landis paid. That is, at least 87% of the victims have been unable to exercise the putative option, and of the few that did, most actually paid above the standard contractual option price.

**B.  The Co-Conspirator Defendants**

79.      In the summer of 2021, the Defendants Berdugo and Petit closed investment deals, including both equity and debt investments, totaling $165 million in the Landis rent-to-own program. Approximately $15 million was invested as equity to support Landis's operations, with the remaining $150 million provided as a debt facility to enable Landis to purchase residential properties used by Landis in its rent-to-own scheme. These deals enabled Landis to substantially increase its marketing reach and its capacity.

80.     $150 million of this investment came from a debt facility provided by the Global Atlantic Defendants, which committed funds to be used by Landis to purchase properties for its rent-to-own business, to be secured by blanket mortgages containing an assignment of rents in favor of Defendants Forethought Insurance Co. and Global Atlantic Assured, Ltd.

81.     This financing arrangement effectively ensures that the tenant rent payments to Landis are passed through to Forethought and Global Atlantic as debt service. Thus, Landis is mainly making money from revenue realized in excess of the monthly rent charges, that is, from

the forfeited Homeownership Credits and from any profits made on the resale of the properties to third parties.

82.     For its part, the Global Atlantic Defendants obtain all the financial benefit of being a landlord—*i.e.*, the rental revenue stream—without any of the ordinary offsetting costs and risks, such as the cost of maintenance, repairs, property management and eviction.

83.     The Forethought-Global Atlantic investment in Landis coincided with other large-scale investments by KKR companies in the single-family rental market. At roughly the same time as the investment in Landis through Global Atlantic, its parent, KKR, launched My Community Homes, a company that buys and manages rental properties nationwide.[4] KKR was also a major investor in Home Partners of America, a company accused of involvement in rent-to-own practices similar to the Landis scheme.[5]

84.     The remaining $15 million in the $165 million in 2021 financing came as equity investments assembled by Defendant Sequoia Capital Operations LLC.

85.     Defendant Sequoia acted as the lead investor in that funding by recruiting other investors, helping to structure the deal, and itself providing the largest amount of funding. Sequoia is a sophisticated global investor, active principally in the venture capital sector. The Sequoia investment supported the operations and technology side of the Landis venture. On information and belief, in return for this investment, Sequoia became a significant equity partner in Landis and is participating in the governance of the company through a seat on its board.

86.     Roelof Botha, a partner at Sequoia, said in a written statement made at the time of the funding, "Landis helps families take their very first steps toward homeownership. By

---

[4] https://www.globest.com/2021/06/28/kkr-stakes-a-bigger-claim-in-the-sfr-space-with-new-company/.

[5] https://www.businessinsider.com/home-partners-rent-to-own-low-success-rate-2023-5.

focusing on financial literacy and individualized coaching, we are giving everyone the opportunity to own their home. Landis' technology is particularly relevant to those with low-to-moderate income who have been neglected by traditional financial solutions."

87.    Sequoia touts its involvement in Landis as follows: "Landis help renters become homeowners. Its algorithms can tell anyone what they need to buy a home. It helps clients find their dream home, rent it and purchase it when they're ready to take on a mortgage." *See* https://www.sequoiacap.com/companies/landis/.

88.    Among the investors pulled in by Sequoia were the investment funds owned by the celebrities Will Smith and Jay-Z. Although these investments represented a relatively small portion of the above-mentioned $165 million in total investments, Landis uses them to promote its services on social media, in the trade press[6] and, for at least a year after the deal was made, in news stories run in regional Black-owned newspapers throughout the country.[7]

89.    The Investor Defendants are all sophisticated players in the financial and business markets. Investor Defendant Sequia has extensive experience investing in technology companies, including the capacity to analyze their business models to understand their anticipated sources of revenue and expenses. The Global Atlantic Defendants have extensive experience investing in

---

[6] *See, e.g.,* "Jay-Z and Will Smith Back Rent-to-Own Firm in $165 Million Round," Bloomberg, July 27, 2021, *available online at* https://www.bloomberg.com/news/articles/2021-07-27/jay-z-and-will-smith-back-rent-to-own-firm-in-165-million-round; "Landis raises $165M with funding from Will Smith, Jay-Z–backed company," The Real Deal, July 21, 2021, *available online at* https://therealdeal.com/new-york/2021/07/27/landis-raises-165m-with-funding-from-will-smith-jay-z-backed-company/.

[7] *See, e.g.,* "Jay-Z and Will Smith invest in rent-to-own housing startup," Richmond Free Press, August 5, 2021, *available online* at https://richmondfreepress.com/news/2021/aug/05/jay-z-and-will-smith-invest-rent-own-housing-start/; "Jay-Z, Will Smith Invest in Program to Help Renters Purchase Homes," The Washington Informer", August 3, 2022, *available online at* https://www.washingtoninformer.com/jay-z-will-smith-invest-in-program-to-help-renters-purchase-homes/.

the real estate market as well as in the rent-to-own sector. Upon information and belief, all Investor Defendants conducted substantial due diligence into Landis prior to making their investments. This due diligence revealed to them the necessarily fraudulent nature of Landis's operations: that for Landis to generate profit that would enable it to pay off its creditors and appreciate in value for its equity-holders, the majority of the Landis Pathways to Homeownership were expected to fail.

C. **Plaintiffs' Experiences**

**Tangela Bankston**

90.     Plaintiff Tangela Bankston is an African-American working mother in her 40s who has never owned a home.

91.     Sometime around January 2022, a post on Instagram caught her attention. It was by the mother of the pop celebrity Beyoncé, promoting a new investment by her son-in-law, Jay-Z, in the Landis rent-to-own program, and linking her post to a news story about the Jay-Z and Will Smith investment from a social media site called "BlackWealthify." Attracted by this promotion, Plaintiff Bankston submitted an inquiry on the Landis website.

92.     At the time Plaintiff submitted the inquiry, she was a chapter 13 debtor, nearly having completed her plan payments. A representative from Landis who contacted her by phone explained the program as helping her build back her credit so that she could get a mortgage, through a service called "coaching." He told her that she could apply for acceptance into the program as soon as she received her bankruptcy discharge.

93.     Ms. Bankston received her bankruptcy discharge a few months later and then submitted an application. On April 6, 2022, Plaintiff received two separate standard form communications from Landis, transmitted to her by email, that notified her of Landis's approval for participation in its 12-month "Homeownership Program." The stated "Program Specifics"

were an assumed home purchase "Budget" of $160,000; an "Initial Down Payment

Contribution" of $4,000; and a "Total Monthly Payment" of $1,591, consisting of a rental

payment and "an Additional Down Payment Saving."

94.    A few hours later she received a second email, titled "Landis Approval Letter,"

stating that, at any time during the first 12 months of a lease, Plaintiff would be able to purchase

her chosen home for 3% above the "appraisal price" of a property that Landis purchased for her,

and that in order to start searching for a property she would have to first pay Landis the "down

payment contribution" and that this payment would be held by Landis "in an escrow account."

95.    In conformity to the Landis standard practice, the "approval" communications

stated that she would get a refund of the supposedly escrowed funds, subject only to limited

expense reimbursement obligations, in the event she backed out before Landis took title but

disclosed nothing about the disposition of the funds in the event she was unsuccessful in

purchasing the property from Landis.

96.    Following these "approval" communications, Landis referred Plaintiff Bankston

to a Philadelphia-area real estate agent who, it instructed her, would help her search for a home.

On information and belief, this agent had participated in promotional trainings conducted for real

estate agents by Landis and was expecting a commission from Landis.

97.    Both that agent and Landis represented to Ms. Bankston that, once she selected a

home that Landis approved, Landis would buy it for her and temporarily rent the property to her,

while helping her build up her credit and savings until she was able to get a mortgage in order to

go to settlement to become the owner.

98.    The agent thereafter began showing her houses, as if she were to be the buyer,

encouraging her to choose carefully "her forever home."

99.     Plaintiff Bankston selected a property at 4838 Devereaux Street, Philadelphia and soon thereafter, on April 30, 2022, Landis invoiced her for $4,700 for her "Initial Deposit Contribution." Plaintiff paid this amount on May 5, 2022. This payment, as well as all subsequent payments she made to Landis, were made on the Landis web-based payment portal.

100.     Several days after making that payment, a Landis representative contacted her to tell her that, based on the price of the property she had chosen, she needed to pay an additional $200, which she did on May 16, 2024. In total, therefore, she paid Landis $4,900 before signing any agreement.

101.     On May 25, 2022, Landis emailed Plaintiff Bankston a set of the standard four documents composing the "Pathway to Homeownership" agreement, filling them out as being between Plaintiff and Defendant Landis Properties II, and requesting her to sign them electronically. As described above, the Agreement consisted of four separate contract documents, including (a) an Agreement of Sale ("Standard Agreement for the Sale of Real Estate"), (b) a Lease, (c) a "Pathway Overview," and (d) an "Addendum" to the Agreement of Sale.

102.     The Agreement of Sale, with her as the Buyer and Defendant Landis Properties II as the Seller, stated that she would be purchasing the Devereaux Street property from Landis for $252,350—*i.e.,* 58% higher than the $160,000 "Approved Budget" figure Landis had determined she could afford—with a settlement date one year in the future, on May 25, 2023.

103.     The Agreement of Sale contained the standard mortgage contingency and inspection waiver; it did not list the $4,900 payment she had already paid as a deposit towards the purchase, and instead, in accordance with Landis' standard practice, left the "Deposit" line blank.

104.    The Lease signed by Plaintiff Bankston was for the same one-year term as the Agreement of Sale. It listed Defendant Landis Properties II as "the Landlord." It stated a monthly rental amount of $1,735, and a one-month security deposit of $1,735.

105.    In accordance with the Landis customary practice, typed into the lease form was the following language: "Tenant responsible for the first $200 in repairs. Thereafter Landlord and Tenant shall share expenses for repairs 50% to each party provided Tenant submits quotes for the repair to the Landlord in advance of the work."

106.    Plaintiff was also presented for signature with a "Landis Homeownership Pathway Overview", which she signed electronically along with the other standard contract documents. Using the Landis standard language, the Overview stated that:

    a.  Landis "intends to purchase" the Devereaux Street property and "has agreed to rent" the property to Plaintiff (here, "the Customer") for the duration of the lease term, or "until the Customer obtains third-party financing to complete the purchase of the Property from Landis;"

    b.  In order to move into the property, Plaintiff had to pay a total of $5,911, consisting of a security deposit of $1,735, pro-rated rent for May 2022 of $347, and an "initial payment of $3,829 for Landis Homeownership Credits;" and

    c.  Her monthly payment obligation would actually be $2,399, consisting of monthly rent of $1,735 and $664/month "for Landis Homeownership Credits (as hereinafter defined), to be counted towards the purchase of Property from Landis the termination of this Agreement (or payable in whole or in part to Landis as liquidated damages in the event that Customer breaches this Agreement or fails to complete the purchase of the Property)."

107.    The "Addendum" Plaintiff Bankston also was presented with and signed,

    a.  Stated that her Earnest Money Deposit in her agreement of sale was $3,829, plus the additional $664/month payments;

    b.  Contained the standard disclaimer of Landis having any obligation to provide Plaintiff with any "Credit Services;" and

      c.   Contained the standard "Failure to Complete the Purchase" paragraph regarding the forfeiture of her Landis Homeownership Credits to cover 3% of the purchase price, plus "any outstanding fees and payments owed to Landis."

108.    On the same day that Landis obtained Plaintiff Bankston's signature on the four Landis contract documents, Defendant Landis Properties II LLC separately closed on a purchase of 4838 Devereaux for the price of $246,000. Plaintiff was not present at that separate closing and had no role in negotiating the price or any other terms.

109.    Landis used funds provided by the debt facility provided by the Global Atlantic Defendants to pay for this purchase, which was secured by a mortgage on the Devereaux Street property in favor of Defendants Forethought Insurance Company and Global Atlantic Assured, Ltd.

110.    Plaintiff Bankston and her three children moved into the property the day after the two closings and began making the required monthly payments.

111.    Over the course of her time residing in the property, the Landis representative serving as Plaintiff's "coach" would call her on roughly a monthly basis, using a current credit report to make suggestions about how to build up her credit.

112.    Soon after moving into the property, the second-floor bathtub began leaking through the living room ceiling, and water also began accumulating around a toilet in the finished basement.

113.    As there was no local management company assigned to manage the lease, Plaintiff contacted her Landis coach about the water leaks. He referred her to the real estate agent who had shown her the property, who, in turn, gave her the name of some plumbers.

114.    One plumber that she called at her own expense discovered a covered drain in the basement floor and uncovered it to try to drain the water in the basement.

115.    Also at her own expense, Plaintiff had to hire an extermination company to deal with a serious, longstanding rodent infestation that she discovered a few months into the lease.

116.    At some point, Plaintiff was informed by a municipal inspector that the foundation of the property was cracked and that water was entering the basement through these cracks. After emailing Landis "property management" and having several phone calls with Landis representatives about this problem, Landis eventually offered to pay $11,000 towards repairs to the foundation, but only if Plaintiff agreed to a $5,000 increase in her purchase price.

117.    Not knowing if $11,000 would even be sufficient to produce a dry basement, and at the end of her rope regarding the condition of the property, Plaintiff stopped paying Landis and moved out around the end of 2022.

118.    In total, Plaintiff paid Landis $17,589 on its web portal from May to November. Landis refunded none of this money, nor did it ever provide her an accounting.

119.    In January 2023, Landis entered into a materially identical Homeownership Program agreement with a new consumer for 4838 Devereaux, for the same purchase price and a slightly higher monthly rental, using its four standard contract forms. That consumer, too, ended up vacating the property due to the poor condition of the property after making substantial payments to Landis, which were also not refunded.

**Tiffany Robinson**

120.    Plaintiff Tiffany Robinson is an African-American working mother in her 40s who has never owned a home.

121.    In the Spring of 2022, Plaintiff's lease was expiring and she decided to try to buy a home, but because her credit score was low, she knew that buying a house was not a present possibility.

122.    On or about April 14, 2022, after seeing the same Instagram post about Landis from Beyoncé's mother that attracted Plaintiff Bankston, Ms. Robinson submitted an application on the Landis website.

123.    On May 3-4, 2022, Plaintiff Robinson received two "Landis Approval" communications via email, advising her that she "meets the requirements for the Landis Homeownership Program in the amount of up to $195,000." The text included the same standard language as the approval letter sent to Plaintiff Bankston, including reference to a required "initial down payment contribution" of $4,000 that would be held by Landis in an "escrow account" to be used for an eventual future purchase of her home.

124.    She was further advised in these communications to begin searching with "your agent" for homes that either were built after 1978 or had "recent full-scale renovations."

125.    As she had no real estate agent of her own, Landis referred Ms. Robinson to the same agent who showed properties to Plaintiff Bankston.

126.    After looking at approximately ten "for sale" properties, Plaintiff selected the Philadelphia row house at 1228 Adams Avenue, and the agent reported the selection to Landis.

127.    Landis informed Plaintiff that, due to the price of that property, her total down payment would be $4,300, which Landis further informed her would have to be paid before Landis would put in an offer to the owner.

128.    Plaintiff paid the demanded $4,300 on or around May 10, 2022. This, and all future payments to Landis, were made over the payment portal on the Landis website.

129.    On May 11, 2022, Landis sent a standard follow-up email communication to Plaintiff, advising her that the owner of 1228 Adams Avenue had accepted Landis's offer at a

price of $215,000. This email also reiterated that Plaintiff's initial deposit and her additional

monthly payments would be deposited into her "down payment savings account."

130.    The May 11 email also included the first breakdown of Plaintiff Robinson's

financial obligations to Landis regarding her rent-to-own transaction. It stated that she would

have to pay $2,106/month, consisting of $1,523 in rent and $583 for her "savings."

131.    Plaintiff wrote back, saying that the monthly obligation was too much for her, that

she was looking to pay around $1,500 monthly.

132.    On May 23, 2022, Landis provided Plaintiff with updated numbers. Her monthly

obligation would be reduced to $1,797, consisting of $1,523 in rent and $274 for her "savings."

However, that was conditioned on her increasing her "initial down payment" to $8,000.

133.    Plaintiff made the requested additional deposit, bringing her total "down

payment" to $8,000.

134.    On May 31, 2022, Landis emailed Plaintiff a set of the standard "Pathway to

Homeownership" contract documents, filling them out as being between Plaintiff and Defendant

Landis Properties II, and requesting her to sign them electronically. As described above, these

included (a) an Agreement of Sale, (b) a Lease, (c) a "Pathway Overview," and (d) an

Addendum.

135.    The Agreement of Sale, with her as the Buyer and Defendant Landis Properties II

as the Seller, stated that she would be purchasing the Adams Avenue property from Landis for

$217,300, with a settlement date two years in the future, on May 31, 2024. This price was 11%

higher than the $195,000 budget figure Landis had previously provided her.

136.    The Agreement of Sale contained the standard mortgage contingency clause and inspection waiver, and did not list the substantial payment she had already given Landis as a Deposit.

137.    The separate Lease Plaintiff Robinson was presented and signed, with Defendant Landis Properties II as "the Landlord," was for a two-year term. It stated a monthly rental amount of $1,452, and a one-month security deposit of $1,452. The lease listed as the Landlord contact for repairs and emergencies as only an email address, properties@landis.com.

138.    In accordance with the Landis customary practice, typed into the lease form was the following language: "Tenant responsible for the first $200 in repairs. Thereafter Landlord and Tenant shall share expenses for repairs 50% to each party provided Tenant submits quotes for the repair to the Landlord in advance of the work."

139.    Plaintiff was also presented with a "Landis Homeownership Pathway Overview", which she signed. Using the Landis standard language, the Overview stated that:

  a.  Landis "intends to purchase" the Adams Avenue property and "has agreed to rent" the property to Plaintiff (here, "the Customer") for the duration of the lease term, or "until the Customer obtains third-party financing to complete the purchase of the Property from Landis;"

  b.  In order to move into the property, Plaintiff had to pay $8,129, consisting of a security deposit of $1,452, and an "initial payment of $6,677 for Landis Homeownership Credits;"

  c.  She was required to pay $129/month in additional Homeownership Credits over and above her monthly rent payments of $1,452; and

  d.  The accumulated Homeownership Credits would be applied to the costs of her future purchase but could be "payable in whole or in part to Landis as liquidated damages in the event that Customer breaches this Agreement or fails to complete the purchase of the Property."

140.    The "Addendum" Plaintiff Robinson also was presented with and signed,

    a.  Stated that her Earnest Money Deposit in the agreement of sale was $6,677, plus the additional $129/month payments;

    b.  Contained the form disclaimer in which Landis disclaimed any obligation to provide any "Credit Services;" and

    c.  Contained the standard "Failure to Complete the Purchase" paragraph regarding the forfeiture of her Landis Homeownership Credits to cover 3% of the purchase price, plus "any outstanding fees and payments owed to Landis."

141.    On the same day of and following Plaintiff Robinson's signing of the four Landis contract documents relating to the property at 1228 Adams Avenue in Philadelphia, Defendant Landis Properties II LLC separately closed on a purchase of that property for the price of $205,000. Plaintiff was not present at that separate closing and had no role in negotiating the price or any other terms.

142.    Landis used funds provided by the debt facility provided by the Global Atlantic Defendants to pay for this purchase, which was secured by a mortgage on the Devereaux Street property in favor of Defendants Forethought Insurance Company and Global Atlantic Assured, Ltd..

143.    Plaintiff Robinson moved into the property following the two closings and began paying the required combined monthly payment.

144.    The "coaching" service began soon after moving in. It consisted of monthly calls with her Landis coach, who would review her credit report with her and make suggestions about strategies to raise her score. These sessions, which were over the telephone, occurred on roughly a monthly basis.

145.    After Plaintiff moved in, serious problems with the condition of the property—all of which related to its habitability—became apparent. These included:

    a.  An HVAC system that was under warranty but which, Plaintiff learned, was powered by a heat pump that was too small to reach the third floor;

b.   A new back door that was not hung properly and allowed in air;

c.   An absence of insulation on the back wall;

d.   Bugs coming through the exhaust fan over the stove;

e.   Missing bannisters that made two stairways dangerous; and

f.   Water in the basement.

146.   The flow of water into the basement was particularly serious. Plaintiff discovered that some water was coming in through cracks in the foundation, but more critically, a deteriorated, exterior BILCO door into the basement had been hidden by the previous owner behind plastic and rocks and, during a heavy rain, water poured into the basement through that opening. This rotting door into her home also presented a serious security danger.

147.   Plaintiff complained about these problems in emails to the address Landis had designated for repair and maintenance issues.

148.   Landis offered to pay for ½ the cost of a BILCO door, but nothing else, including the cost of installing a new frame to hold the door securely. Landis also offered a slight reduction in the price Plaintiff would pay for the house. Plaintiff did not accept either offer.

149.   Plaintiff lived with these problems, while continuing to make payments. Ultimately, she decided that, despite her substantial investment in the property, it was not nearly worth the $217,300 she was obligated to pay and she vacated the property.

150.   Plaintiff has now come to learn that Landis purchased the Adams Avenue property from a speculator who purchased it only four months before Landis purchased it. The speculator paid only $93,000. Given the poor condition of the property, what that means is that the prior owner had flipped it to Landis after doing only cosmetic repairs.

151.     Plaintiff made approximately $27,500 in payments to Landis, none of which has been refunded by Landis.

152.     On September 3, 2024, Landis emailed Plaintiff with a final accounting of the $10,186.00 in "deposits" it claimed to be holding for Plaintiff. According to this accounting, these deposits consisted of a security deposit of $1,452 and $8,734 in "HOC", meaning Home Ownership Credit.

153.     According to this same accounting, Landis claimed that Plaintiff is only entitled to a refund of $167.49 from the $10,186.00 in deposits. The accounting provided the following explanation for the deductions to which Landis claimed it could take: an "Exit Fee Calculation" coming to $6,519.00 and the remainder being applied to back rent and late charges. The latter component of the calculation illustrates that, even though Plaintiff was originally charged a $1,452 security deposit, Landis treated almost $2,000 of the money paid by Plaintiff towards her Home Ownership Credit "savings" as an additional security deposit it was free to take.

## V.     CLASS ALLEGATIONS

154.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of similarly situated individuals. They seek class certification under Rule 23(b)(2) and (b)(3).

155.     The proposed nationwide class (the "Class") is defined as:

All individuals who entered into a rent-to-own agreement with Landis but did not purchase the property from Landis.

156.     The Class is so numerous that joinder of all individuals in the class would be impracticable. As alleged above, in Philadelphia and Delaware Counties alone, Plaintiffs have identified 69 properties involved in the Landis scheme, as well as 63 properties in Georgia.

Given the experience of Plaintiff Bankston, it is likely that some of these were the subject of multiple rent-to-own transactions with members of the proposed Class. Given these figures and the fact that Landis operated similarly in at least 8 states, the class includes at least hundreds of members. The precise number of members of the Class will be determined from Defendants' records.

157.    Plaintiffs' claims are typical of the Class in that, among other things, Plaintiffs and members of the Class were all injured by the same unlawful conduct, which resulted in similar forms of monetary loss.

158.    Plaintiffs are adequate representatives of the Class and their claims are typical of those of the Class. There are no issues or defenses unique to Plaintiffs, and Plaintiffs have no conflicts with members of the Class.

159.    Counsel for Plaintiffs are experienced in the prosecution of complex, class-action litigation and have appeared as counsel and as lead counsel in class actions across the United States. Counsel are providing and will provide an unusual level of specialized knowledge and skill.

160.    There are issues of fact and law common to the Class that will predominate of any individual issues because Defendants have engaged in a common course of conduct throughout the relevant period. Some of these common issues of fact and law:

    a.  Whether the alleged association involving the Defendants constitutes an "enterprise" within the definition of 18 U.S.C. § 1961;

    b.  The success record of the Landis Homeownership Program;

    c.  The amount of revenue Landis has earned from forfeited "Homeownership Credits" and gains from the sale of properties to third parties as opposed to its revenue from the sale of properties to its tenants;

    d.  The profile of the consumers and the properties Landis's algorithms are targeting;

38

e.  The representations and incentives used by Landis in its marketing to real estate brokers;

f.  Whether the Landis Defendants directed the enterprise through a pattern of wire fraud;

g.  The extent of Investor Defendants' knowledge about the Landis scheme including due diligence undertaken;

h.  Whether the Landis Defendants are a "credit repair organization" within the meaning of 15 U.S.C. § 1679a(3)(A) and whether their attempt to contractually disclaim that status is legally valid;

i.  Whether the Landis Defendants are "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed," 15 U.S.C. § 1679b(b), despite their representations that the service is free, in violation of CROA; and

j.  Whether the Landis Defendants engaged in unfair and deceptive conduct in violation of state consumer protection law.

161.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual claims of the class members are too small to warrant their bringing individual actions. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here. To the best of Plaintiffs' knowledge, there is no other action brought on behalf of the class against the Defendant.

## VI.    LEGAL CLAIMS

**FIRST CAUSE OF ACTION**
**Operation of RICO Enterprise, 18 U.S.C. § 1962(c)**
**(Against Defendants Landis Technologies, Berdugo and Petit)**

162.    Plaintiffs incorporate and reallege the preceding paragraphs as though fully set forth herein.

163.    Going back at least three years and continuing to the present time, Defendants Landis Technologies Inc., Berdugo and Petit have operated the "Landis Properties" business, which includes the various affiliated Landis companies. This is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and will be referred to as "the Landis Enterprise" or "the RICO Enterprise."

164.    Besides Defendants Landis Technologies, Berdugo and Petit, this association-in-fact enterprise is comprised of the various Landis companies, including Landis Properties I LLC, Landis Properties II LLC, Landis Properties Investors LLC, Landis Properties Investors II LLC, and their various subsidiaries and agents; investors including the Global  Defendants and Defendant Sequoia Capital, that provided the capital necessary to fund the illegal scheme; and real estate agents who steer victims to the illegal scheme and assist in furthering the impression that victimized customers are selecting and moving into a property that Landis will be buying for them.

165.    This is an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4), and will be referred to as "the Landis Enterprise" or "the RICO Enterprise."

166.    The Defendants making up the RICO Enterprise had the common purpose of attracting Class members into the predatory rent-to-own agreements with onerous contract-break fees. Defendants collect upfront and ongoing tenant investments towards the cost of a supposed future property purchase, knowing and intending these purchases would likely not occur,

enabling Defendants to keep the accumulated customer "savings" or any realized gains from the sale of the properties to third parties.

167.    The participants in the RICO Enterprise had direct business relationships with each other through their common ownership, investment, referral and/or service relationships.

168.    The RICO Enterprise used the interstate wire systems in carrying out this fraud, among other ways, through its communication with borrowers and collection of payments, in violation of 18 U.S.C. § 1343.

169.    This illegal conduct, insofar as it occurred for years, in a continuing and open-ended manner, constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1) and (5).

170.    Besides its use of the interstate wire system, the RICO Enterprise also affected interstate commerce insofar as it was based in New York and operated through the purchase and leasing of properties in over ten other states.

171.    Defendants played distinct roles in the operation, management, and control of the RICO Enterprise through this pattern of racketeering activity. Defendants Landis Technologies Inc., Berdugo and Petit were at the center of the illegal scheme, designing, implementing and operating the fraudulent business model utilizing the other Landis entity Defendants as their instruments. Defendants Global Atlantic and Forethought provided the financing necessary to purchase the properties used to lure victims into the false promise of home ownership, and Sequoia Capital raised and provided operating capital for the scheme. Real estate agents worked on behalf of Defendants to funnel a steady stream of victims who were unable to qualify for mortgages to the Defendants and worked with Defendants to identify properties eligible for use in the scheme.

172.    Defendants Landis Technologies Inc., Berdugo and Petit are each a "person" as that term is used in 18 U.S.C. § 1961(3).

173.    Defendants Landis Technologies Inc., Berdugo and Petit knowingly and with intent to defraud took steps to advance the fraud and to conceal the fraud from consumers and regulators.

174.    By associating with and being employed by an enterprise affecting interstate commerce, Defendants violated 18 U.S.C. § 1962(c) by conducting or participating in the Landis Enterprise's affairs through a pattern of racketeering activity through a pattern of wire fraud.

175.    Plaintiffs and the members of the Class suffered monetary losses by reason of this violation, including all monies paid to Landis as part of their rent-to-own obligations.

176.    As a result, Plaintiffs and the members of the Class are entitled to actual damages, treble damages, and attorney fees and costs, pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
### Conspiring in a RICO Enterprise, 18 U.S.C. § 1962(d)
### (Against All Defendants)

177.    Plaintiffs incorporate and reallege the preceding paragraphs as though fully set forth herein.

178.    All of the Landis Defendants are central participants in the scheme and took active steps to knowingly facilitate the fraud.

179.    Global Atlantic Financial Group and its two subsidiaries, Forethought Insurance Co. and Global Atlantic Assurance Ltd—and Sequoia Capital (together these Defendants being referred to as "the Investor Defendants"), with knowledge of the fraudulent purposes underlying the Landis Enterprise, agreed to assist the Enterprise by financing its operation.

180.    The Investor Defendants all conducted substantial due diligence into the Landis Enterprise before investing. This provided them with the knowledge that the public- and

customer-facing representations about the RICO Enterprise were illusory and fraudulent; that the program was designed to fail by targeting aspiring homeowners unable to obtain a mortgage; that the Enterprise was not contractually obligated to do anything to assist the snared consumers into becoming mortgage qualified; and that the program was in reality designed to rent properties without being subjected to the ordinary expenses of being a landlord and to collect backend fees from tenants and/or gains realized from sales to third parties.

181.    Global Atlantic and its two subsidiaries provided a $150 million debt facility that enabled Landis to rapidly scale up its acquisition of properties used in the scheme. Without these investments, the RICO Enterprise could not have reached the scale it has achieved.

182.    Defendant Sequoia invested and raised millions of dollars from other investors, made public statements to help conceal the fraud, and participated in the governance of Landis Technologies, on information and belief, through a seat on the Landis board.

183.    The conduct of all Defendants in furthering the aims of the RICO Enterprise, as described above, was knowing and intentional and constitutes conspiracy in the operation of a RICO Enterprise.

184.    By agreeing to further the above-described fraudulent scheme, with knowledge of the fraud, Defendants conspired to violate 18 U.S.C. § 1962(c), and therefore violated 18 U.S.C. § 1962(d).

185.    Plaintiffs and the members of the Class suffered monetary losses by reason of this violation, including all monies paid to Landis as part of their rent-to-own obligations.

186.    As a result, Plaintiffs and the members of the Class are entitled to actual damages, treble damages, and attorney fees and costs, pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violations of Credit Repair Organizations Act, 15 U.S.C. §§ 1679 *et seq*.**
**(Against Defendant Landis Technologies Inc.)**

187.     Plaintiffs incorporate and reallege the preceding paragraphs as though fully set forth herein.

188.     Defendant Landis Technologies, Inc. is a "person" who uses instrumentalities of interstate commerce, including the interstate wire systems, to provide assistance or to represent that they will provide assistance, in return for payment of money, with regard to improving their consumer customers' credit rating. For that reason, Defendant is a "credit repair organization" within the meaning of the Credit Repair Organizations Act, ("the Act"), 15 U.S.C. § 1679a(3).

189.     The Homeownership Credits that Defendant charges and collects, both at the beginning of the Landis rent-to-own agreements and over the course of the agreements, constitute "valuable consideration" which Defendants charge and collect in advance of performing any services related to assisting customers improve their credit rating, in violation of the Act, 15 U.S.C. § 1679b(b).

190.     Defendant failed to provide Plaintiffs and the members of the Class the disclosures required by 15 U.S.C. § 1679c; failed to use the contractual form and language required by 15 U.S.C. § 1679d; and failed to provide the cancellation notice required by 15 U.S.C. § 1679e.

191.     The disclaimer contained in the Homeownership Program agreement—stating that Landis Properties II LLC is under no obligation to provide "credit services" and does not charge for any such services—is irrelevant as to Defendant Landis Technologies and/or is void under 15 U.S.C. §1679f, and pursuant to that section, constitutes a further violation of the Act.

192.     The amounts paid by Plaintiffs and the members of the Class in excess of rental charges, including all of the "Home Ownership Credits," are recoverable actual damages under 15 U.S.C. § 1679g(a)(1)(B), and attorney's fees and costs under 15 U.S.C. § 1679g(a)(3).

193.     Given the number of consumers adversely affected, the nature, frequency and persistence of Defendant's violations, and the intentionality of Defendant's conduct, Plaintiffs and the Class are also entitled to punitive damages under 15 U.S.C. § 1679g(a)(2) and (b).

## FOURTH CAUSE OF ACTION
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,
73 P.S. § 201-1 et seq., and Similar Statutes in Other States
(Against Defendants Berdugo, Petit, Landis Technologies Inc. and Landis Properties II LLC)**

194.     Plaintiffs incorporate and reallege the preceding paragraphs as though fully set forth herein.

195.     Defendants Berdugo, Petit, Landis Technologies Inc. and Landis Properties II LLC are engaged in trade and commerce in the Commonwealth of Pennsylvania in that, in advertising and in their follow-up offers of sale, they engage in rent-to-own transactions with Pennsylvania consumers aspiring to become homeowners.

196.     In the course of marketing and consummating these transactions, Defendants engaged in deceptive conduct which creates the likelihood of consumer confusion and misunderstanding, in violation of 73 P.S. § 201-2(4)(v), (ix), (xxi), including but not limited to,

    a.   Representations and practices designed to create the impression that the subject property is being purchased by Landis for the consumer;

    b.   Targeting consumers likely to have little understanding about the process of purchasing real estate and then using representations and practices designed to create the impression that Landis is acting in the interests of the consumer, *e.g.*, with regard to the price set for the properties;

    c.   Allowing and inducing unrepresented consumers to engage in a complex, nontraditional real estate sales transaction, even when they know the consumer is confused about the nature of the transaction;

     d.   Contradictory representations about the consumer funds being "saved"—also referred to as Home Ownership Credits—that are supposedly being escrowed for the customer's benefit in a nonexistent "escrow account";

     e.   Splitting the "Home Ownership Agreement" into four separate contract documents that have terms and conditions that contradict the marketing and sales representations and the terms and conditions of the other documents;

     f.   Misleading and contradictory representations regarding the disposition of the deposited "savings" fund in the event the property purchase is not completed;

     g.   Illegally shifting the responsibility for making habitability repairs to the consumer "tenant" and collecting sums that are treated as security deposits in excess of what is allowed by law; and

     h.   Representing that Landis provides a "coaching" service designed to help the consumers improve their credit standing in order to obtain a mortgage, while disclaiming the contractual obligation to perform that service.

197.    This conduct constitutes "unfair or deceptive acts or practices," as defined by the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2(4)(v), (xxi), and, as such, is a violation of that statute, 73 P.S. 73 P.S. § 201-3.

198.    Plaintiffs and other Pennsylvania members of the Class were victimized by such violations and, as a result, suffered the loss of money and property.

199.    Plaintiffs and other Pennsylvania members of the Class are entitled to treble damages, plus an award of attorney's fees and costs, pursuant to 73 P.S. § 201-9.2(a).

200.    Those members of the Class who reside in states with statutory protections similar to the UTPCPL are similarly entitled to relief under those provisions. *See* Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 through 8-19-15; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 through 501.213; Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370 through 10-1-375; Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1 through 24-5-0.5-12; Kentucky Consumer Protection Act, Ky. Rev.

Stat. Ann. §§ 367.110 through 367.361 and 367.990; N.C. Gen. Stat. §§ 75-1.1 through 75-35;

Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 through 1345.13, and

Deceptive Trade Practices Act, Ohio Rev. Code Ann. §§ 4165.01 through 4165.04; Tennessee

Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 through 47-18-125.

## VII.    REQUESTED RELIEF

Plaintiffs request the following relief:

a. That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to Class members;

b. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate RICO, CROA, and state law;

c. That the Court award Plaintiffs and the other Class members actual damages;

d. That the Court award Plaintiffs and Class members trebled damages under RICO and state law;

e. That the Court award Plaintiffs and Class members punitive damages under CROA;

f. That the Court award Plaintiffs and the other Class members pre- and post-judgment interest on any recovery;

g. That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

h. That the Court award such other relief as the Court may deem just and proper.

## VIII.    JURY DEMAND

Plaintiffs and the proposed Class demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Date: October 18, 2024

/s/ *Irv Ackelsberg*
LANGER, GROGAN & DIVER P.C.
Irv Ackelsberg, PA Bar No. 23813
iackelsberg@langergrogan.com
John J. Grogan, PA Bar No. 72443
jgrogan@langergrogan.com
Mary Catherine Roper, PA Bar No. 71107
mroper@langergrogan.com
David A. Nagdeman, PA Bar No. 327652
dnagdeman@langergrogan.com
1717 Arch St., Ste 4020
Philadelphia, PA 19103
(215) 320-5660

*Attorneys for Plaintiffs*